PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* ELOY
BOSCH, Defendant and Appellant.

No. 4579. Argued May 19, 1932—Decided July 7, 1932.
Rehearing denied July 29, 1932.

*Pedro M. Porrata* for appellant.   *R. A. Gómez, Fiscal,* for appellee.

Mr. Justice Wolf delivered the opinion of the Court.

On the 4th of July, 1930, the appellant was a watchman of the Central Matilde located in the Judicial District of Ponce. It appears that the property of the said central is very extensive and that a public road runs through it; in other words, that property of the Central Matilde lies on both sides of the highroad.  On the said 4th of July, some-one told the appellant that two men were cutting grass on the property of the central, and this without permission. The two men apparently were indicated to the appellant and were then on the highroad where he joined them.   There was some evidence tending to show that the appellant drew a revolver and that one of the complaining witnesses struck him with a *"mocho."*  This is a truncated machete.  Nothing further apparently happened except the arrest of the appellant.

There is no question that the defendant was actually on the highroad with a revolver on his person.  It appears that he had been employed as a watchman for more than twenty years and that his business, similar to the *mayordomo's* was to go around the property.  He was authorized by his employers to carry a revolver.

The appellant was convicted of the offense of carrying a prohibited weapon under Act No. 14 of June 25, 1924.  When this act went into effect its constitutionality was attacked on various grounds.  One of the grounds was that no arms were specified by the act.  We answered this in *People v. Cruz,* 34 P.R.R. 305, to the effect that the arms involved were the same or similar to those enumerated by the Act of 1905 (Comp. Stat. 1911, sec. 5994).  This case became a leading one and was cited in *People v. Alonso,* 35 P.R.R. 435, as deciding that recourse should be had to the earlier act to determine the nature of the weapons.

Similarly, in *People* v. *Acevedo,* 34 P.R.R. 439, and *People* v. *Vadi,* 34 P.R.R. 441, we sustained the act in a somewhat different way. Section 1 of the act provided: "That any person unlawfully carrying any arm or instrument with which bodily injury may be caused, shall be punished by imprisonment for a term of from one to six months." We held that this section was complemented by section 5 of the act, which reads thus:

"That the provisions of this Act shall not be applicable—

"1. To the carrying of implements, tools and instruments pertaining to the arts, professions, trades, and occupations or sports when carried by reason or on occasion thereof;

"2. To the carrying of commonly used walking-sticks, provided they do not contain swords or other arms prohibited by this Act;

"3. To the carrying of pocket-knives or folding pocket-knives the blades of which do not exceed three inches in length;

"4. To the carrying of hunting arms when used for said purposes by a person having a license therefor; *Provided,* That hunting licenses shall continue to be granted in accordance with the special law on the subject;

"5. To the carrying of arms within one's dwelling or estate;

"6. To the carrying of crutches, canes, or other similar articles by invalids or cripples when required by their bodily condition."

In other words, we decided that the definition of what was a prohibited weapon was to be found by taking the two sections together.

Considering the act again we hold that the word "unlawfully" in the first section thereof must mean any use of an arm or instrument that is without the exceptions contained in section 5, *supra.* It is therefore evident that a person who falls within the exceptions named in the act has committed no offense in carrying a revolver. We are also of the opinion that the burden falls upon the government, when the question is doubtful, to show that the person charged with carrying a weapon falls without the exceptions enumerated or within the definition of the law as we have construed it.

The law against the use of prohibited weapons is ordinarily in the nature of preventive justice. People are continually arrested for the carrying of weapons where no illegal use has arisen or in most cases not even intended. Carrying a weapon in self-protection does not by itself reveal an intention to use it for illegal purposes. Under section 117 of the Code of Criminal Procedure a private person may arrest another for a public offense committed or attempted in his presence. The appellant maintained that he had a right to restrain people from taking the property of his employer and that he had a right to go into the highroad for that purpose in the manner that he did. It was on producing his revolver, apparently, that he received wounds from one of the complaining witnesses.

A good deal of the discussion in this case was on the question of whether a *"mayordomo"* or watchman was on his own property when acting as such *"mayordomo"* or watchman. We think he was.

The jurisprudence seems to be to the effect that a mere employee is not within his property but that an overseer or a watchman is. In North Carolina it was held in one case, *State* v. *Terry,* 93 N. C. 585, 53 Am. Rep. 472, that overseers, superintendents, and the like were the agents of the owner and that they might be considered to be on their own property but an ordinary employee was not. In the subsequent case of *State* v. *Anderson,* 39 S. E. 824, the court held that a watchman was like an overseer or superintendent and was the agent of his employer. A *"mayordomo"* or watchman has necessarily the use and occupation of the property that he traverses. It is not necessary that he should live thereon or, to justify his right to use a weapon, that the owner of the property should lease an interest in the land to him or give him some nominal titular right to be in the property. Within the intendment of the law he has such right and no artificial means to give him title or ownership is necessary.

The *Fiscal* of this Court said that he could not understand how the idea arose in Puerto Rico that a *"mayordomo"* or watchman could be considered as being on his own property. The *Fiscal* says that he has searched all the jurisprudence of this Court and has found nothing which would justify such an assumption. The assumption proceeds not from the decisions of this Court but from the previous acts. Section 2 of the Act of March 12, 1908, for example, provides as follows:

"The preceding section shall not apply to a person in actual service, as a militiaman, nor to a peace officer, holding office as judge, fiscal, marshal, deputy marshal or bailiff of the insular or federal courts, persons engaged in the guarding of prisoners while so employed, policeman, nor to a revenue officer in the discharge of official duty, nor to the keeping or carrying of arms by the proprietors, lessees, administrators, overseers, or watchman of a farm while on or within the same or while going to or returning from same, as well as while within their private houses or buildings under their care or guardianship; nor to a person engaged in the military or naval service of the United States, nor to persons carrying the United States mail, nor to persons charged with the custody of insular or municipal property or funds, as watchman or keepers, carrying a written authorization from the superior officer having the supervision of such property or funds; neither shall it apply to the carrying of ordinary folding pocket knives, having blades less than three inches in length; neither shall it apply to the instrument known as *machete,* when the same is being used or carried *bona fide,* by the owner or possessor thereof, as a necessary incident to his occupation. *Provided,* that the authorization given by this Act to owners, lessees, administrators, overseers or watchmen of agricultural properties, in order to be valid outside such premises, must be confirmed at the request of the parties concerned, by the respective municipal judges."

It is evident that the Legislature considered owners, lessees, administrators, overseers or watchmen of agricultural properties as being in more or less the same category, a question of *noscitur a sociis.* It is true that that act required the persons named therein, including the owners, to obtain permission from the municipal judge to use a pistol outside of

the premises. Evidently the Legislature of 1924 did not think it necessary for the persons enumerated to have such a permission because the Act of 1924 contains no such requisite. Formerly the owners of premises were required to take out a license but now they are not. Neither are the other persons enumerated in the Act of 1908. That act did not create rights in the agents. It merely recognized the existence of such rights. In other words, what is the fact, namely, that a watchman while performing his job is on his own premises.

Did the appellant cease to be such watchman, when to reprimand or restrain persons taking grass from the property of the employer, he went forth into the highroad? We think not. The going unto the highroad under such conditions was clearly within his duties. If we are right in our contention that a watchman has a right to use a pistol while performing his duties, it follows that the watchman's going out to the highroad was a deed or performance entirely within his employment or the scope thereof.

Here we may interpose that similar to the case of Cruz, reference may be had to acts *in pari materia* to determine what was the intention of the Legislature. So that in this connection we are quite satisfied that section 5 of the Act of 1924 intended to cover watchmen in the same way as they had been covered in 1908 but without the necessity of obtaining a license while about their duties.

There is still another aspect in this case, namely, the matter of intention. This Court discussed it in *People* v. *Ortega*, 35 P.R.R. 715. When a watchman steps off his property to restrain offenders there is no possibility of ascribing to him an intent to violate the law. It is true that the offense of carrying prohibited weapons is *malum prohibitum* and not *malum in se*, but the union of act and intent must occur. This intent does not appear where a man merely incidentally appears on the highroad with no intention of remaining there with his pistol. He is without an *animus manendi;* on the

contrary, his *animus* is to return to his duties, or rather to continue performing his duties on the property, as soon as possible.

We do not care to stress the point but a watchman may be considered to be on his own property when he steps on the highroad lying between two pieces of property belonging to his employer.

The judgment appealed from will be reversed and the defendant discharged.

Mr. Justice Hutchison concurs in the result.

The Chief Justice and Mr. Justice Aldrey dissented.

ON MOTION FOR REHEARING

July 29, 1932.

MR. JUSTICE WOLF delivered the opinion of the Court.

While we may have differed a little in our reasoning, the members of the Court who formed the majority had no doubt that a watchman duly employed is on his own property when engaged in his duties as such watchman and that no offense is committed within the definition of the law if, in pursuit of his duties, he steps out into the highroad.

Likewise the majority of the Court was of the opinion that a watchman who steps on a highroad lying between two pieces of property belonging to the same person is, in contemplation of law, still on his own property. We are also of the opinion that a watchman has a right to carry a pistol while going to and coming from his house to perform his duties.

With respect to the definition of the crime, naturally we did not mean to say that the government would have to allege and prove that the defendant was without the exceptions enumerated in section 5 of the law. What we had in mind was that we had been compelled, in defining the law, to obtain aid from the exceptions so enumerated.

The former opinion was not based on the previous statutes or the authority given by them but we cited them rather to

show that the Legislature at that time had the idea that overseers and watchmen, when acting as such, were on their own property. None of the acts says that a watchman is on his own land in performing his duties. That a watchman is on his own land is a general consideration supported by the act of 1908.

We do desire, however, to explain a part of our opinion. We said:

"The law against the use of prohibited weapons is ordinarily in the nature of preventive justice. People are continually arrested for the carrying of weapons where no illegal use has arisen or in most cases not even intended. Carrying a weapon in self-protection does not by itself reveal an intention to use it for illegal purposes."

We were only discussing generally that the intention to commit any other crime was not revealed by the mere use of a revolver, but we do not think we said, and we certainly did not mean to say, that anyone could escape conviction when he was carrying a revolver by saying or attempting to prove that he had no intention to commit a crime. We were merely trying to emphasize the fact that the use of a revolver was not *malum in se*. The intention is disclosed by the carrying of the weapon, as we have said in other cases.

The motion for reconsideration will be denied.

Mr. Justice Hutchison concurs in the result.

The Chief Justice and Mr. Justice Aldrey dissented.